## UNITED STATES DISTRICT OCURT
## DISTRICT OF MINNESOTA

Joseph R. C.,                                    Case No. 18-cv-456 (JRT/TNL)

      Plaintiff,

v.                                               **REPORT &**
                                                 **RECOMMENDATION**

Nancy A. Berryhill,
Acting Commissioner of Social Security,

      Defendant.

Stephanie M. Balmer, Falsani, Balmer, Peterson & Balmer, 1200 Alworth Building, 306 West Superior Street, Duluth, MN 55802-1800 (for Plaintiff); and

James Sides, Special Assistant United States Attorney, Assistant Regional Counsel, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Joseph R. C. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 12) and the Commissioner's Motion for Summary Judgment (ECF No. 15). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

1

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 15) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in November 2014, asserting that he has been disabled since July 5, 2011 due to depression, anxiety, chronic fatigue, myasthenia gravis, and carpal tunnel syndrome. (Tr. 11, 233, 245; *see* Tr. 319-20, 346, 353, 378, 390.) Plaintiff's application for DIB was denied initially and again upon reconsideration. (Tr. 11, 244-45, 247, 258, 260; *see* Tr. 262-72.) Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 11, 273-74; *see* Tr. 275-95.)

The ALJ held a hearing on February 14, 2017. (Tr. 11, 189, 191; *see* Tr. 299-314.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review. (Tr. 1-33, 315-18.) As part of his request for review, Plaintiff submitted additional evidence, consisting of medical records from 2010; his own diary/journal entries from December 2014 through March 2017; and a medical source statement, dated April 1, 2017. (Tr. 2; *see* Tr. 76-102, 104-88.) With respect to the 2010 medical records, the medical source statement and Plaintiff's diary/journal entries through December 31, 2016, the Appeals Council determined that the evidence did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision." (Tr. 2.) Accordingly, the Appeals Council "did not consider and exhibit

2

this evidence." (Tr. 2.) As for Plaintiff's diary/journal entries from January through March 2017, the Appeals Council stated "[t]he additional evidence d[id] not relate to the period at issue." (Tr. 2.) Because Plaintiff's case was decided "through December 31, 2016," this evidence did "not affect the decision about whether [he was] disabled beginning on or before December 31, 2016." (Tr. 2.)

Plaintiff subsequently filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 12, 15.) This matter is fully briefed and ready for a determination on the papers.

## III. ANALYSIS

### A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

### B. Relevant Time Period

In order to be entitled to DIB, Plaintiff must establish that he was disabled before his insurance expired. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). Plaintiff's date last insured was December 31, 2016. (Tr. 11, 233, 245, 247, 260, 353, 378, 390; Comm'r's Mem. in Supp. at 1, 3, ECF No. 16.) Thus, Plaintiff must prove that he was disabled before December 31, 2016. Accordingly, the period presently at issue is July 5, 2011, the alleged onset date, through December 31, 2016, the date last insured. Nevertheless, "[e]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Cox*, 471 F.3d at 907 (quotation omitted).

### C. Issues Raised

Plaintiff challenges the ALJ's assessment of his sleep disorders and his carpal tunnel syndrome. Plaintiff argues that the ALJ erred by concluding that his sleep disorders did not meet or equal a listed impairment and failed to account for his fatigue and inability to stay on task when determining his residual functional capacity. Plaintiff additionally argues that the ALJ's residual-functional-capacity determination only included handling and fingering limitations for his right hand due to carpal tunnel syndrome and did not account for carpal tunnel syndrome in his left hand as well. Further, Plaintiff argues that the ALJ's residual-functional-capacity determination did not account for limitations he has in the use of both of his hands. Lastly, Plaintiff argues that the Appeals Council erred by "refusing to consider" the additional evidence submitted with his request for review.

### 1. Sleep Disorders Meet or Equal a Listed Impairment

Among other severe impairments, the ALJ found and concluded that Plaintiff had the severe impairments of narcolepsy and "sleep apnea with hypersomnolence and fatigue," and these impairments when considered individually or in combination with other impairments did not meet or equal a listed impairment. (Tr. 13-14.) In finding that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ noted that "[c]ognitive deficits related to the obstructive sleep apnea, narcolepsy, and chronic fatigue have not been observed in physical examinations." (Tr. 14.)

### a. Medical Records

Plaintiff has a history of obstructive sleep apnea and uses a CPAP machine. (Tr. 426, 430, 748, 752, 781-82, 785-87, 789, 808-09; *see* Tr. 801, 806, 811, 847, 849-50.) Plaintiff has participated in "several previous sleep studies," which showed severe sleep apnea. (Tr. 426; *see* Tr. 748, 752, 841-45.) In 2010, Plaintiff reported being "worried that he may lose his job as he has difficulty focusing at work and will leave work in order to take a nap and will also nap after work." (Tr. 785; *see* Tr. 786.)

In November 2011, Plaintiff was seen for continued complaints of "excessive daytime sleepiness." (Tr. 426.) Plaintiff reported that "[s]leep [wa]s not refreshing for him on most days," and he took "naps daily for up to 2 hours a day." (Tr. 426.) Plaintiff reported that he was "afraid to drive for fear of falling asleep at the wheel." (Tr. 426.)

Plaintiff also reported that he had "quit using [c]affeine with no change in his daytime sleepiness." (Tr. 426.) Adderall[1] and Ritalin[2] did not help either. (Tr. 429, 430.)

Plaintiff reported "getting anywhere from 6-12 hours" of sleep. (Tr. 426.) Plaintiff went to bed between 10:00 and 11:00 p.m., falling asleep within 20 minutes, and then got up at 9:00 a.m. (Tr. 426.) Plaintiff reported getting up one or more times during the night. (Tr. 426.)

Upon examination, Plaintiff was "[a]wake, alert and oriented." (Tr. 428.) Plaintiff's treatment provider discussed Plaintiff's depression as a source of his sleepiness in light of his history. (Tr. 426, 429; *see* Tr. 444, 781-84, 787, 789-93, 809, 830; *see also* Tr. 798, 806.) Plaintiff denied being depressed. (Tr. 426, 429.) It was recommended that Plaintiff be seen in internal medicine for further evaluation and the CPAP pressure be "rechecked." (Tr. 429.)

Plaintiff was seen by Donald L. Deye, M.D., in early December for an evaluation. (Tr. 430, 444.) Plaintiff reported increasing fatigue since he was a teenager and that "[h]e has been tired for as long as he can remember." (Tr. 430, 444; *see* Tr. 445.) Plaintiff reported that he has tried "many different medications without success" for depression. (Tr. 444.) Plaintiff reported that, despite sleeping between eight and ten hours per day, he continues to have fatigue and difficulty concentrating. (Tr. 430.) Plaintiff also reported

---

[1] Adderall is a brand name for a combination of dextroamphetamine and amphetamine, and is used to treat symptoms of attention deficit disorder and narcolepsy. *Dextroamphetamine and Amphetamine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601234 html (last visited Jan. 23, 2019).

[2] Ritalin is a brand name for methylphenidate, a medication which is also used to treat symptoms of attention deficit disorder and narcolepsy. *Methylphenidate*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682188 (last visited Jan. 23, 2019).

taking "naps twice daily" and generally being "able to sleep well at night after that." (Tr. 444.) Plaintiff additionally reported drinking between six and eight caffeinated sodas per day. (Tr. 435.) Dr. Deye directed Plaintiff to consult with the neurology clinic. (Tr. 432; *see* Tr. 445.)

Plaintiff met with neurology approximately ten days later for complaints of excessive fatigue. (Tr. 445.) Plaintiff described his fatigue as: "low energy, 'no ambition', 'I can't hardly stand', and 'I can't function.'" (Tr. 445.) Plaintiff reported that he quit working "in July 2011 because of excessive fatigue." (Tr. 445.) Plaintiff again reported that he had tried medication without success. (Tr. 445.) Plaintiff also reported that "[h]e has been evaluated by psychiatrists and tried . . . different anti-depressants . . ." without success. (Tr. 445.) Plaintiff stated that he quit taking his antidepressant medications approximately eight months ago because they did not work. (Tr. 445.)

Plaintiff described having a "reversed" sleep schedule. (Tr. 445.) Plaintiff went to bed at 10:00 p.m. and slept until midnight. (Tr. 445.) Plaintiff watched movies most of the night. (Tr. 445.) Plaintiff then slept again from 5:00 a.m. to noon. (Tr. 445.)

Plaintiff was alert and oriented, "without evidence of confusion, aphasia[3], or dysarthria[4]." (Tr. 447.) Plaintiff was assessed as having chronic fatigue, poor sleep hygiene, and obstructive sleep apnea among other things. (Tr. 448.) Plaintiff's symptoms

---

[3] "Aphasia is a disorder caused by damage to the parts of the brain that control language. It can make it hard for you to read, write, and say what you mean to say." *Aphasia*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/aphasia.html (last visited Jan. 23, 2019).

[4] "Dysarthria is a condition in which you have difficulty saying words because of problems with the muscles that help you talk." *Dysarthria*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/ency/article/007470.htm (last visited Jan. 23, 2019).

were noted to be "most consistent with chronic fatigue and not excessive daytime hypersomnolence[5]." It was noted that Plaintiff had "symptoms of depression" but denied being depressed. (Tr. 448.) There was no "neurological cause for his excessive fatigue," and he did "not have symptoms of narcolepsy." (Tr. 449.) Plaintiff "became angry when . . . [it was] suggested that his excessive fatigue may be related to depression, anxiety, poor sleep hygiene, lack of exercise, and tobacco smoking and he stormed out of the office." (Tr. 449.)

Plaintiff followed up with Dr. Deye in early January 2012 with continued complaints of fatigue without improvement. (Tr. 450, 452.) Plaintiff reported that he resumed taking clonazepam[6] at bedtime for panic attacks approximately one month ago. (Tr. 452.) Plaintiff would "'take it for 4 or 5 days, [and] be sleeping normally again.'" (Tr. 452.) Then he would stop taking "'it for a week or two.'" (Tr. 452.) Plaintiff reported being upset that he was "'so tired'" and not able to do things. (Tr. 452.) Plaintiff was not interested in a psychiatric consultation, stating "'[i]t would be [his] 15th opinion." (Tr. 452.)

Dr. Deye instructed Plaintiff to reduce his clonazepam dose "to just one at bedtime as needed for insomnia" as "[f]atigue is caused or made worse by clonazepam." (Tr. 453.) Dr. Deye also encouraged Plaintiff to "[t]ry to gradually wean off of this to improve

---

[5] Hypersomnolence is excessive daytime sleepiness. *See Drowsiness*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/ency/article/003208.htm (last visited Jan. 23, 2019).
[6] Clonazepam is a medication "used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)," and goes by the brand name Klonopin. *Clonazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682279.html (last visited Jan. 23, 2019).

fatigue." (Tr. 453.) Dr. Deye prescribed a trial of nortriptyline[7] and referred Plaintiff for a psychiatric consultation. (Tr. 453.)

Plaintiff consulted with Timothy M. Magee, M.D., in psychiatry at the end of February. (Tr. 467.) Plaintiff discussed his history of treatment for chronic fatigue and depression without success. (Tr. 467.) Plaintiff reported that "[h]e has been off on disability for the last eight months because he is 'too tired to work.'" (Tr. 467.)

Dr. Magee noted that Plaintiff was "[v]ery intelligent and seems to want help," but "[t]he chronicity of his disability places this in some doubt." (Tr. 467.) During the mental status examination, Plaintiff demonstrated "[t]angential distractibility" and had no memory impairment. (Tr. 470.) Dr. Magee noted that "[t]he diagnosis isn't clear." (Tr. 470.) Dr. Magee prescribed a trial of Adderall to see if Plaintiff's energy, attention, and concentration improved, and directed Plaintiff to return in approximately one month. (Tr. 471.)

Plaintiff saw Dr. Magee two more times, once in May and once in June. (Tr. 474-477.) During each of these visits, Plaintiff demonstrated normal attention and concentration, and his memory was not impaired. (Tr. 475, 477.) In May, Plaintiff reported that the Adderall helped briefly and then stopped working. (Tr. 474.) Dr. Magee switched Plaintiff to Ritalin. (Tr. 475.) When Plaintiff returned in June, he reported that Ritalin worked for three weeks and then stopped. (Tr. 476; *see* Tr. 839.) Dr. Magee increased Plaintiff's Ritalin dosage. (Tr. 477.)

---

[7] "Nortriptyline is used to treat depression." *Nortriptyline*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682620 html (last visited Jan. 23, 2019).

Plaintiff saw Dr. Deye towards the end of July.  (Tr. 481.)  Plaintiff reported feeling tired and not being able to concentrate.  (Tr. 481-82; *see* Tr. 837.)  Plaintiff also reported "'need[ing] a nap every couple hours.'"  (Tr. 482.)  Plaintiff mentioned a recent vacation he took with his wife to South Dakota and stated he "could hardly do it" despite the fact that "[w]e go there all the time."  (Tr. 481.)  Plaintiff also mentioned his Adderall and Ritalin trials with Dr. Magee, stating "I've seen Dr. Ma[g]ee.  He says there's nothing he can do for me."  (Tr. 481.)  Plaintiff reported that he was no longer taking Ritalin.  (Tr. 481.)  Plaintiff was also trying to quit smoking.  (Tr. 481.)

When Plaintiff next saw Dr. Deye approximately two months later, he was "having a panic attack as [Dr. Deye] enter[ed] the room."  (Tr. 491.)  Plaintiff reported, "'I've been really bad.  I'm a mess.  I don't like living like this.  I don't have a good quality of life.'"  (Tr. 492.)  Plaintiff also reported that he had quit smoking and lost 45 pounds using his treadmill every day.  (Tr. 491.)  In addition, Plaintiff reported that he had recently begun seeing F. S. Abuzzahab, Sr., PhD, MD, a psychopharmacologist.  (Tr. 491; *see* Tr. 607-19.)  *See infra* Section III.C.1.b.

Plaintiff followed up with Dr. Deye again in early December.  (Tr. 502.)  Plaintiff continued to have complaints of fatigue and was "sleeping long hours."  (Tr. 502.)

Plaintiff's next appointment with Dr. Deye was in mid-March 2013.  (Tr. 513.)  He was still feeling "[t]ired all the time."  (Tr. 513.)

During an appointment with Dr. Deye at the end of August for an unrelated concern, Plaintiff reported that he had been feeling "'really, really tired[, s]leepy tired, not exhausted

tired[,]" since an endocrinologist he met with a month prior made some adjustments to his thyroid medication.  (Tr. 535; *see* Tr. 531-34.)

In early September 2014, Plaintiff had a consultation at the Noran Neurological Clinic for complaints of fatigue and weakness.  (Tr. 709.)  Plaintiff reported having "constant fatigue for many years and . . . having this problem since high school."  (Tr. 709.)  Plaintiff reported that "he gets tired easily and . . . feels like he never slept."  (Tr. 709.)  Plaintiff also reported "that he 'cannot get going' until noon and then the evening or the night time are the best time when he is most active."  (Tr. 709.)  Plaintiff "takes a nap at night and sometimes is awake all night."  (Tr. 709.)  Plaintiff also "takes multiple naps during the day."  (Tr. 709.)

Among other things, Plaintiff reported "difficulty concentrating, memory loss, arm weakness, . . . numbness and tingling, . . . daytime sleepiness, waking feeling unrefreshed, [and] difficulty falling asleep."  (Tr. 709.)  Upon examination, Plaintiff's attention and concentration were "normal"; his memory was "good"; and he was able to "follow[] commands without difficulty."  (Tr. 710.)  Plaintiff's chronic fatigue was thought to be "due to lack of sleep problems" rather than a neuromuscular problem.  (Tr. 710.)

A week later, Plaintiff had a neurology appointment at the Cambridge Medical Center to address complaints of fatigue.  (Tr. 563.)  Plaintiff reported "feel[ing] fatigued to the point that he can't carry out tasks."  (Tr. 563.)  Plaintiff did "not have fatigable weakness on exam," and there was "[n]o evidence of primary neurological disease as [the] cause of [his] fatigue."  (Tr. 564.)  Plaintiff's treatment provider noted that "we discussed

the multiple causes of fatigue and it seems he has had them tested." (Tr. 564.) It was also noted that Plaintiff had failed to respond to treatment for fatigue. (Tr. 564.)

During an appointment with Dr. Deye in November for an unrelated condition, Plaintiff told Dr. Deye that he "spent a week and a half asleep after . . . [a medication] change." (Tr. 688.) Plaintiff also reported that he was "working on a DC motor mount for a shaper." (Tr. 688.)

In January 2015, Plaintiff consulted with the Minneapolis Clinic of Neurology in connection with his continued fatigue. (Tr. 752.) Plaintiff reported taking three or four 90 minute naps every day. (Tr. 752, 748.) Plaintiff's attention and memory were normal. (Tr. 753.) Plaintiff met with a sleep specialist later that month. (Tr. 748; *see* Tr. 754.) Plaintiff was alert, and his memory was normal. (Tr. 750.) The sleep specialist prescribed a trial of Mirapex[8] and ordered a sleep study. (Tr. 750.)

In early March, Plaintiff underwent a sleep study at the North Memorial Sleep Health Center. (Tr. 722-44; *see also* Tr. 746-47.) As part of a questionnaire in preparation for the study, Plaintiff reported that he takes four naps per day for 90 minutes each. (Tr. 741.) Plaintiff reported that he does not feel refreshed after a typical night's sleep and experiences excessive sleepiness during the day. (Tr. 741.) The sleep study confirmed Plaintiff's diagnosis of severe obstructive sleep apnea and the efficacy of his current CPAP settings. (Tr. 722; *see* Tr. 746.) Plaintiff was able to drive after the study. (Tr. 723; *see* Tr. 747.)

---

[8] Mirapex is a brand name for pramipexole, a medication used to treat the symptoms of Parkinson's disease and restless leg syndrome. *Pramipexole*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a697029 (last visited Jan. 23, 2019).

In May, Plaintiff underwent a work evaluation conducted by Pine Habilitation and Supported Employment, Inc. (Tr. 413-14; *see* Tr. 380.) "The primary intent was to determine whether [Plaintiff] could be employed in a part-time position for at least a four-hour shift, in a job of his skill sets due to his chronic fatigue." (Tr. 414.) The evaluation was scheduled for 15 days, "but after five days, it was determined that the evidence was clear and additional days would not be required." (Tr. 414.) Of the five days Plaintiff was scheduled to be evaluated, Plaintiff was only able to complete one four-hour session. (Tr. 414; *see* Tr. 380.) Plaintiff was able to complete partial sessions on two other days, and was "unable to make it to work" on the remaining two days. (Tr. 414; *see* Tr. 280.) Staff observed that Plaintiff "appeared to be lightly sleeping." (Tr. 414.) Plaintiff also demonstrated "[p]ossible signs of fatigue . . . , which included being 'forgetful' in regards to computer skills, with regards to his level of expertise." (Tr. 414.) "Based on . . . [these] observations and [Plaintiff's] extensive journaling documentation, it [wa]s . . . recommend[ed] that [Plaintiff] would be unable to be competitively employed in a part[-]time position." (Tr. 414; *see* Tr. 380.) Based on this evaluation, Eric Beager, MS, CRC, a vocational rehabilitation counselor, wrote a letter in support of Plaintiff's application, stating that "it is clear that [Plaintiff] would not be able to meet an employer's expectation of competitive employment." (Tr. 380; *see* Tr. 208.)

Towards the end of June 2015, Plaintiff met with Richard A. Blackburn, PhD, LP, CBSM, in behavioral sleep medicine. (Tr. 909, 923; *see* Tr. 878, 886.) Plaintiff reported being tired all of the time and "sleeping often." (Tr. 909.) Plaintiff reported that he "'hits the wall and cannot function' and has to lie down." (Tr. 909.) Plaintiff reported drinking

14

"a lot of caffeine" to combat the sleepiness. (Tr. 909.) Plaintiff reported that he had to leave his previous employment because of his daytime fatigue. (Tr. 919.) Blackburn diagnosed Plaintiff with hypersomnolence disorder, and recommended additional diagnostic testing. (Tr. 920.) Based on the available evidence, Blackburn "suspect[ed] this might be more of a depression or medication issue." (Tr. 922.) In particular, Blackburn wondered about Plaintiff's clonazepam prescription. (Tr. 921-22.)

When Plaintiff saw Dr. Deye at the end of December, he had no chief complaints, but noted that he was "'tired all the time.'" (Tr. 988.) Plaintiff reported caring for his wife who recently broke her arm and needed surgery. (Tr. 986.) Plaintiff described himself as "'her right hand man.'" (Tr. 986.) Dr. Deye noted that Plaintiff "was starting to sleep better on gabapentin[9]." (Tr. 990.)

Towards the end of September 2016, Plaintiff returned to "the sleep clinic." (Tr. 1049.) Plaintiff reported sleeping 14 to 16 hours per day "unless on [A]dderall and Vyvanse[10] as needed for when he 'has something to do.'" (Tr. 1049.) Plaintiff did not feel rested after he slept. (Tr. 1049.) Plaintiff reported that he "[i]s unable to safely drive due to fatigue and disabled as a result." (Tr. 1049.) Plaintiff was referred to the Hennepin County Medical Center's sleep lab for additional evaluation. (Tr. 1050; *see* Tr. 1052.)

---

[9] Gabapentin is "used to help control certain types of seizures," "relieve the pain of postherpetic neuralgia," and "treat restless legs syndrome." *Gabapentin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a694007 html (last visited Jan. 23, 2019).

[10] Vyvanse is the brand name for lisdexamfetamine, a medication used to treat attention deficit hyperactivity disorder. *Lisdexamfetamine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a607047.html (last visited Jan. 23, 2019).

In November, Plaintiff was diagnosed with narcolepsy without cataplexy.[11] (Tr. 851; *see* Tr. 1068, 1071, 1082, 1086.) "[F]indings [were] suggestive of profound hypersomnia." (Tr. 1083; *accord* Tr. 1086.) It was recommended that Plaintiff taper off of clonazepam and start taking sodium oxybate[12]. (Tr. 1083, 1087.) During an appointment in December, Plaintiff's attention was within normal limits and his memory intact. (Tr. 1084, 1088.) "Strategies to improve total sleep time, sleep environment and sleep hygiene were discussed" as well as "[t]he importance of a regular sleep-wake cycle . . . ." (Tr. 1085; accord Tr. 1089.)

### b. Relevant Psychiatric Records

In September 2012, Plaintiff began meeting with Dr. Abuzzahab, a pharmacologist.[13] (Tr. 607-19.) Plaintiff regularly met with Dr. Abuzzahab from 2012 throughout 2016. (*See* Tr. 621-81, 757-79, 1111-50.) Plaintiff reported feeling depressed and tired and having little energy. (Tr. 608, 679, 762, 769, 1121; *see* Tr. 611, 1143.) Plaintiff also reported trouble concentrating and completing tasks as well as occasional forgetfulness. (Tr. 608, 610, 611-12, 633, 657, 1131; *see* Tr. 612, 646. *But see* Tr. 643.) Plaintiff continued to report daytime fatigue. (Tr. 613, 625, 633, 657, 667, 679; *see* Tr.

---

[11] "Narcolepsy is a chronic neurological disorder that affects the brain's ability to control sleep-wake cycles. People with narcolepsy usually feel rested after waking, but then feel very sleepy throughout much of the day." *Narcolepsy Fact Sheet*, National Institute of Neurological Disorders and Stroke, National Institutes of Health, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Narcolepsy-Fact-Sheet (last visited Jan. 23, 2019). "Many individuals with narcolepsy also experience uneven and interrupted sleep that can involve waking up frequently during the night." *Id.* Cataplexy is "sudden muscle weakness while awake that makes a person go limp or unable to move," and is a symptom of narcolepsy. *Id.*

[12] "Sodium oxybate is used to prevent attacks of cataplexy . . . and excessive daytime sleepiness in adults and children 7 years of age and older who have narcolepsy . . . ." *Sodium Oxybate*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a605032.html (last visited Jan. 23, 2019).

[13] Dr. Abuzzahab's treatment notes are handwritten and often difficult to read. (*See, e.g.*, Tr. 613, 626, 629, 636, 644, 653, 664, 772; *see also* Pl.'s Mem. in Supp. at 11, ECF No. 13.)

623-24.)  Notwithstanding his complaints of fatigue, Plaintiff noted in an August 2012 diary/journal entry that he gave to Dr. Abuzzahab that he "built a table/stand for the treadmill," so that he could have his computer in front of him.  (Tr. 623.)

Dr. Abuzzahab diagnosed Plaintiff with, among other things, major depressive disorder, severe chronic dysthymia, hypersomnolence, and anxiety.  (Tr. 617, 626, 630, 634, 637, 641, 645, 651, 654, 658, 661, 664, 668, 671, 680, 759, 763, 767, 770, 773, 776, 778, 1114, 1116, 1118, 1120, 1122, 1124, 1126, 1128, 1140, 1142, 1144, 1146.)  During this time, Dr. Abuzzahab prescribed a number of medications including but not limited to fluoxetine[14], Ritalin, alprazolam[15], clonazepam, trazodone[16], Vyvanse, and Parnate[17]. (*See, e.g.*, Tr. 619-21, 626-28, 631, 635, 638-39, 646-49, 652, 655-56, 659, 662, 665-66, 669, 672-73, 678, 681, 757, 760-61, 768, 771, 774, 779, 1138.)  Overall, Plaintiff did not feel that the medications were beneficial.  (*See, e.g.*, 674-75, 764-65, 1098-99, 1111-12.)

Dr. Abuzzahab advised Plaintiff not to take naps during the day to improve his sleep at night and increase his exercise.  (Tr. 630, 637.)  Dr. Abuzzahab also encouraged Plaintiff to get a part-time job to lift his mood, volunteer, and speak with a vocational counselor. (Tr. 651. 654, 776.)

---

[14] "Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder . . . , some eating disorders, and panic attacks."  *Fluoxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a689006 html (last visited Jan. 23, 2019).

[15] "Alprazolam is used to treat anxiety disorders and panic disorder . . . ."  *Alprazolam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a684001 html (last visited Jan. 23, 2019).  Xanax is a brand name for alprazolam.  *Id.*

[16] "Trazodone is used to treat depression."  *Trazodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a681038 html (last visited Jan. 23, 2019).

[17] Parnate is the brand name for tranylcypromine, a medication "used to treat depression in people who have not been helped by other medications."  *Tranylcypromine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682088 html (last visited Jan. 23, 2019).

Around mid-2015, Plaintiff started reporting improvements in his mood. (*See* Tr. 1119, 1121, 1123, 1125.) In October 2015 and after, Dr. Abuzzahab noted that Plaintiff's depression was in partial remission. (Tr. 1126, 1128, 1137-38, 1140-42.)

In May 2015, Plaintiff began to regularly see Scott Allen TenNapel, PhD, for psychotherapy in connection with his depression and anxiety. (*See, e.g.*, Tr. 872, 880, 883, 886, 889, 903, 906, 924, 927, 930, 933, 936, 939, 952, 955, 958, 961, 964, 967, 977, 980, 983, 1000, 1003, 1006, 1009, 1012, 1014, 1017, 1020, 1023, 1026, 1029, 1032, 1035, 1038, 1040, 1043, 1046, 1063, 1066, 1068, 1071.) Plaintiff reported that "[h]e is constantly tired," and quit his job "because he could not manage to get through a day without napping." (Tr. 873; *see* Tr. 875.) Plaintiff also reported low energy and trouble concentrating. (Tr. 873.)

Dr. TenNapel noted that Plaintiff "has grossly disordered sleep. He naps approximately 3 times per day. He tries to stay up until 10 PM but typically is too drowsy to stay awake by 9." (Tr. 873; *see* Tr. 886.) Plaintiff's wife "gets home late," and he tries to watch television with her. (Tr. 873.) Plaintiff reported that "[h]e falls asleep quickly but only sleeps for about 3 hours," at which point "[h]e gets up and works on the computer until he feels sleepy again." (Tr. 873.) Plaintiff described "his first night's sleep" as "'like another nap.'" (Tr. 873.)

Similar to Dr. Abuzzahab's observations, Dr. TenNapel started noticing a difference in Plaintiff's outlook in and around September 2015. (Tr. 952, 955, 958.) In October, Dr. TenNapel described Plaintiff's depression as "stable." (Tr. 961; *see* Tr. 964.) While Plaintiff continued to have some ups and downs, he was overall doing better. (*See* Tr.

1012, 1014, 1017, 1020, 1047.)  At the end of 2016, Plaintiff experienced an increase in symptoms while he was weaning himself off other medications in order to begin treatment for narcolepsy.  (Tr. 1071.)

Plaintiff continued to struggle with excessive fatigue.  (*See, e.g.*, Tr. 955, 958, 961, 964, 967, 980, 983, 1020.)  In January 2016, Plaintiff reported that he was sleeping better, but he was "staying up quite late (2-3 am) then sleeping until around noon."  (Tr. 1000.)  Plaintiff also stopped taking his sleeping medication.  (Tr. 1000.)  During an appointment in May 2016, Plaintiff reported that he slept for 21 hours.  (Tr. 1023.)  Plaintiff continued to struggle with fatigue during the summer of 2016.  (*See, e.g.*, Tr. 1029, 1032, 1035.)  Plaintiff was "trying to consolidate his sleep hours, mostly unsuccessfully."  (Tr. 1038.)  Plaintiff reported that "[n]apping gets in the way," saying "'I really do try, I can be up and functioning and feeling pretty good, then I get into something and get overwhelmingly tired—I literally can't stay awake."  (Tr. 1038.)  Towards the end of August, Dr. TenNapel noted that Plaintiff "is really struggling," describing "[m]id April []as a turning point, when sleep started to break up."  (Tr. 1038.)

With the exception of some occasional distractibility, an instance of "[t]ired," and two instances of some memory impairment, Dr. TenNapel regularly described Plaintiff's attention and concentration as normal and his memory unimpaired.  (*Compare* Tr. 889, 903, 906, 924, 927, 930, 1000, 1040 *with* Tr. 872, 880, 883, 886, 889, 903, 906, 924, 930, 933, 936, 939, 952, 955, 958, 961, 964, 967, 977, 980, 983, 1000, 1003, 1006, 1009, 1012, 1014, 1017, 1020, 1023, 1026, 1029, 1032, 1035, 1038, 1040, 1043, 1046, 1063, 1066, 1068, 1071.)

At one point, Plaintiff was attending vocational rehabilitation, but he was having trouble attending consistently.  (Tr. 883.)  Dr. TenNapel encouraged Plaintiff to "build toward more activity."  (Tr. 890; *see, e.g.*, Tr. 1030, 1033.)  Plaintiff was doing better with housework and engaging in activities, such as teaching a friend's daughter how to swim, caring for his wife while she recovered from surgery, cleaning out his garage, and decluttering.  (*See, e.g.*, Tr. 890, 936, 967, 977, 980, 1000, 1026, 1035; *see* Tr. 983, 986.) Plaintiff reported going on vacation with his wife to South Dakota, where he and his wife "'planned reasonable activities that [he] could do, and she planned things on her own to do while [he] napped."  (Tr. 1063.)  At an appointment with Dr. Deye the day before, Plaintiff described his vacation this way: "'We just got done chasing cows in the grasslands of South Dakota.  About 50 to 100.  Rock hunting.  Got back on Sunday.  Out there for a week.  Sat in the General Lee.'"  (Tr. 1051.)

### c.  Disability Reports & Hearing Testimony

In his function report, Plaintiff reported that he is unable to work due to fatigue, which also causes him to be frustrated and irritable.  (Tr. 363.)  Plaintiff reported that he often naps during the day, but tries to do household chores and activities in his garage, including mowing the lawn with a riding mower, plowing snow, and performing minor repairs.  (Tr. 364-65; *see* Tr. 375.)  Plaintiff had trouble concentrating while reading and is "too tired to pursue any interests."  (Tr. 367; *see* Tr. 364, 368, 375.)  Plaintiff was able to follow "simple structured instructions," such as "numbered lists."  (Tr. 368.)

When asked by the ALJ what prohibited him from working, Plaintiff responded that he "sleep[s] all the time."  (Tr. 206.)  Plaintiff testified that, during his last year of

employment, he would close his office door and nap. (Tr. 210.) He "was napping twice a day and going home for lunch, napping." (Tr. 210.) Plaintiff also would nap after he came home from work. (Tr. 210.) Plaintiff further testified that, except for minor errands, his wife does all of the driving because he might fall asleep. (Tr. 210.) The ALJ asked Plaintiff whether he thought he would experience the same type of drowsiness/fatigue he experienced with narcolepsy with a job that "was more physical in nature" compared to his previous mostly sedentary employment. (Tr. 209.) Plaintiff was not sure. (Tr. 209.)

Plaintiff testified that he gets fatigued easily. (Tr. 211; *see* Tr. 228, 375.)   As an example, Plaintiff stated that he and his wife were moving "some metal angle iron." (Tr. 211.) Plaintiff's wife had "no problem dragging like two of these up to the garage." (Tr. 211.) Plaintiff, on the other hand, could "barely get halfway up to the garage." (Tr. 211.)

In addition, Plaintiff testified that being tired causes him to be forgetful, and he uses reminders on his phone to remember his medications. (Tr. 212.) Plaintiff also has "a hard time following instructions" and has to reread things. (Tr. 212; *see* Tr. 213.) Plaintiff testified that, when his basement flooded due to a broken sump pump, he could not "think of how am I going to get this water out." (Tr. 213.) Plaintiff also gave up his "electronics" hobby. (Tr. 212.) Towards the end of the approximately one-hour hearing, Plaintiff lost his train of thought because he was "really getting tired." (Tr. 231.)

### d. Analysis

Plaintiff argues that the ALJ did not properly consider his sleep impairments, citing § 24580.005 of the Social Security Administration's Program Operations Manual System ("POMS"). POMS is "a policy and procedure manual that agency employees use in

evaluating eligibility for . . . benefits." *Draper v. Colvin*, 779 F.3d 556, 558 (8th Cir. 2015); *see Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004) (describing POMS as "a set of internal rules"). Section 24580.005 is titled "Evaluation of Narcolepsy." POMS DI 24580.005, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424580005. Section 24580.005 notes that "[t]here are no physical abnormalities in narcolepsy, and with the exception of sleep studies, laboratory studies will be normal." *Id.* Plaintiff argues that the ALJ erred by "declin[ing] to find that [his] narcolepsy met or equaled a listed impairment" based on the finding that cognitive deficits had not been observed during physical examinations. (Pl.'s Mem. in Supp. at 10.)

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii); *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"An impairment meets a listing only if it 'meet[s] all of the specified medical criteria.'" *KKC*, 818 F.3d at 370 (alteration in original) (quoting *Sullivan*, 493 U.S. at 530). "An impairment is medically equivalent under the regulations if it is 'at least equal in

severity and duration to the criteria of any listed impairment.'" *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)); *accord* 20 C.F.R. § 404.1526(a). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Id.* at 594 (quoting *Sullivan*, 493 U.S. at 531). "The claimant has the burden of proving that his impairment meets or equals a listing." *Id.* at 593.

Assuming without deciding for purposes of the instant motions that the ALJ did not follow § 24580.005 when evaluating Plaintiff's sleep disorders, Plaintiff has not met his burden to show that his sleep impairments met or equaled a listed impairment. Plaintiff has not pointed to medical evidence showing that his sleep impairments meet or are medically equivalent to the specified criteria. In fact, there is no discussion of the relevant criteria. Plaintiff has not even identified which listing(s) his sleep impairments purportedly meet or equal. As Plaintiff has not shown that his sleep impairments meet or equal a listed impairment, any error by the ALJ in evaluating Plaintiff's sleep impairments at step three was harmless. *See, e.g.*, *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred." (citing cases)).

## 2.  Residual Functional Capacity

The ALJ found and concluded that Plaintiff was capable of performing medium work with additional limitations. (Tr. 17.) Plaintiff was additionally limited to no more than "frequently push[ing], pull[ing], handl[ing], and finger[ing] with [his] right hand." (Tr. 17.) Plaintiff was also limited to "simple routine tasks"; no more than "occasional

superficial contact with supervisors and coworkers"; and "no contact with the public." (Tr. 17.) Plaintiff argues that the ALJ's residual-functional-capacity determination is not supported by substantial evidence because it "does not take into account Plaintiff's *left* carpal tunnel syndrome, his limitations on handling and fingering in both of his hands, or the non-exertional limitations that limit his ability to stay on task." (Pl.'s Mem. in Supp. at 9.)

Plaintiff's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). At the same time, a residual-functional-capacity determination must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quotation omitted); *see Perks*, 687 F.3d at 1092 ("Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]."). "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c).

### a. Non-Exertional Limitations

Plaintiff argues that the ALJ "fail[ed] to account for [his] fatigue and resulting inability to stay on task" when evaluating his capacity to work.  (Pl.'s Mem. in Supp. at 9.)

### i. Relevant Evidence

The Court incorporates by reference the prior discussion of the evidence in the record related to Plaintiff's sleep disorders.  *See supra* Section III.C.1.

### ii. Opinion Evidence

In relevant part, the state agency psychological consultants opined that Plaintiff had sustained concentration and persistence limitations.  Plaintiff was moderately limited in his ability "to maintain attention and concentration for extended periods" and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 240-41; *accord* Tr. 255.)  Plaintiff was otherwise not significantly limited, including in his abilities "to carry out very short and simple instructions" and "make simple work-related decisions."  (Tr. 240-41; *accord* Tr. 255.)  Plaintiff had no "understanding and memory limitations."  (Tr. 240; *accord* Tr. 255.)

Noting Plaintiff's allegation that he could pay attention for one hour, the state agency psychological consultants commented that "[a]ttention and concentration were moderately impacted."  (Tr. 241-42; *accord* Tr. 256.)  "[T]he evidence suggest[ed] that [Plaintiff] can understand, remember, and carry out semiskilled tasks."  (Tr. 242; *accord* Tr. 256.)  Plaintiff could also "attend to tasks for a sufficient period to complete tasks." (Tr. 242; *accord* Tr. 256.)

With respect to Plaintiff's adaption limitations, Plaintiff was moderately limited in his "ability to respond appropriately to changes in the work setting," but otherwise not significantly limited." (Tr. 241; *accord* Tr. 256.) The state agency psychological consultants noted that Plaintiff "appears to have some difficulties with coping with stress," which "may result in moderate difficulties in the workplace." (Tr. 242; *accord* Tr. 256.) They also noted that Plaintiff "can manage the stresses involved with semiskilled work." (Tr. 242; *accord* Tr. 256.)

### iii.  Analysis

Plaintiff argues that the ALJ "disregarded Plaintiff's valid sleep disorder diagnoses, including narcolepsy, and failed to account for [the] impact [his] manifestations of those diagnoses have had on his ability to function." (Pl.'s Mem. in Supp. at 9.) It is plain that the ALJ did not disregard Plaintiff's sleep disorders.

First, the ALJ expressly found that Plaintiff's narcolepsy and "obstructive sleep apnea with hypersomnolence and fatigue" were severe impairments. (Tr. 13.) The ALJ referenced these diagnoses several times in later portions of the decision. (*See, e.g.*, Tr. 14-15, 17-18, 21, 24; *see also* Tr. 20.) In the discussion of the evidence, the ALJ discussed Plaintiff's testimony and his own description of his fatigue and the impact it had on his past employment. The ALJ also noted that "[t]he record shows long standing complaints of fatigue and napping after work." (Tr. 18.) The ALJ also chronicled Plaintiff's course of treatment for excessive daytime sleepiness.

Second, the issue is not whether Plaintiff's sleep disorders cause fatigue but whether Plaintiff's fatigue is disabling. *Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007).

Despite Plaintiff's contention that the ALJ did not account for difficulties staying on task due to fatigue, the ALJ expressly limited Plaintiff to simple, routine tasks based on allegations of fatigue. The ALJ explained that "[t]he limitation to simple as well as routine tasks is more appropriate in light of the effects of subjective fatigue and sleepiness on [Plaintiff's] functioning at times." (Tr. 25.) The ALJ also stated that "[t]he mental status and neurological examinations and therapy notes showing good ability to learn and utilize therapy skills do not support the allegations of needing to use memory aids or being easily overwhelmed." (Tr. 25.)

Third, "where the alleged impairment is one of physical pain or excessive or chronic fatigue, the fact of engaging in daily activities that involve physical motion or exertion can be inconsistent with such severe impairments." *Rodewald v. Astrue*, No. 08-cv-5911 (AJB), 2011 WL 13187192, at *14 n.4 (D. Minn. Mar. 4, 2011) (citing cases). Throughout the decision, the ALJ observed that Plaintiff engaged in a number of activities that were inconsistent with his allegations of disabling fatigue and impaired concentration. These activities included performing "some light chores, prepar[ing] simple meals, mow[ing] the lawn with a rider mower, plow[ing] snow, d[oing] minor household repairs, and d[oing] things in the garage like taking apart an old sewing machine to see how it worked," (Tr. 15; *see* Tr. 23); "etching jewelry, welding, making a computer stand for his treadmill, making a DC motor mount for a shaper, [and] repairing a garage door," (Tr. 16; *see* Tr. 23); caring for his wife while she recovered from surgery, (Tr. 23); and moving appliances, (Tr. 23). *See, e.g.*, *Martin v. Astrue*, No. 09-cv-1998 (RHK/JJG), 2010 WL 2787437, at *8 (D. Minn. June 7, 2018) ("Although she sleeps ten to fourteen hours a night and

occasionally naps during the day, on good days, she is able to prepare meals, bake, do light housekeeping, shop, use a computer, travel, camp, cross-stitch, care for a puppy, run errands, go to birthday parties and the state fair, drive a car, eat at restaurants, and visit friends and family. These daily activities are not consistent with her claim of disabling fatigue."), *adopting report and recommendation*, 2010 WL 2787435 (D. Minn. July 14, 2010). Plaintiff has not challenged the ALJ's determination that his subjective complaints were not wholly credible.

Fourth, the ALJ considered the work evaluation performed by Pine Habilitation and Supported Employment, Inc., and the statement of Plaintiff's vocational counselor that Plaintiff was unable to work due to fatigue. The ALJ determined that this evidence was entitled to "limited weight" because "the inability to complete only one four-hour shift in five days of four-hour shifts [wa]s not consistent with the objective medical findings or the course of treatment." (Tr. 26.) The ALJ noted that "the neurological examination in January 2015 and course of treatment in 2015 were not consistent with the level of physical limitation alleged or with a prolonged period of marked mental symptoms." (Tr. 26.) The ALJ also stated that "[t]he light sleeping and forgetfulness about [Plaintiff's] computer skills in the testing were not consistent with objective medical findings or [Plaintiff's] activities." (Tr. 26.) Plaintiff does not dispute the weight given to this evidence, or the weight given to the state agency psychological consultants and their opinions that Plaintiff was able to pay attention and concentrate notwithstanding his complaints of fatigue.

The role of a reviewing court is "limited and deferential." *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam). Under the "deferential 'substantial

evidence' standard," an ALJ's decision will be "affirm[ed] if a reasonable mind could accept the . . . decision." *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quotation omitted). Plaintiff is essentially asking this Court to reweigh the evidence before the ALJ regarding the effects of his sleep disorders on his ability to function. Yet, a reviewing court "do[es] not reweigh the evidence." *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016) (quotation omitted). While some of the evidence arguably suggests that Plaintiff might have greater limitations in his ability to stay on task due to his fatigue, the ALJ carefully considered Plaintiff's sleeping disorders and thoroughly evaluated the evidence in the record when assessing Plaintiff's residual functional capacity. The ALJ's conclusion that Plaintiff was capable of maintaining attention and concentration to perform simple, routine tasks is supported by substantial evidence in the record as a whole.

### b. Exertional Limitations

Plaintiff argues that the ALJ only accounted for carpal tunnel syndrome in his right hand when placing limitations on his ability to handle and finger, and did not take into account that Plaintiff also has carpal tunnel syndrome in his left hand. Plaintiff also argues that the ALJ did not account for limitations he has in the use of both of his hands.

### i. Medical Records

When Plaintiff saw Dr. Deye in mid-March 2013, he reported that he had "been puttering in the garage," "etching jewelry," and was "looking into getting a welder for use with the jewelry." (Tr. 513; *see also* Tr. 536 ("Been doing some electrical etching.").) Plaintiff reported that his left arm was in pain after he "[l]ifted up the plow on [his] 4 wheeler . . . ." (Tr. 513; *see* Tr. 502.) He was also experiencing pain in his left elbow,

which had been going on for about one month.  (Tr. 513.)  Lifting up his arm exacerbated his pain.  (Tr. 513.)

Plaintiff saw Dr. Deye next in early June.  (Tr. 520, 522.)  Among other things, Plaintiff had complaints of "left elbow pain and weakness of the left arm."  (Tr. 522.) Plaintiff reported that the pain will wake him up at night.  (Tr. 522.)  Plaintiff also reported that he had carpal tunnel syndrome.  (Tr. 522.)  Moving improved Plaintiff's pain.  (Tr. 522.)  During this time, Plaintiff was also "[w]orking in the shop with welders and grinders." (Tr. 522.) Dr. Deye noted that Plaintiff had "palpation tenderness over the radial aspect of the left elbow consistent with bursitis."  (Tr. 522.)  Dr. Deye advised Plaintiff to schedule an appointment with orthopedics if his elbow worsened.  (Tr. 523.)

As previously stated, Plaintiff had two neurology appointments in September 2014 to address complaints of fatigue, one at Noran Neurological Clinic and one at the Cambridge Medical Center.  (Tr. 564, 709.)  *See supra* Section III.C.1.a.  Examination notes from the Noran Neurological Clinic state that Plaintiff's "[m]otor tone bulk and strength [we]re normal throughout the upper . . . extremities," and his "[d]eep tendon reflexes [we]re symmetric . . . ."  (Tr. 710.)  Testing on Plaintiff's right side showed that he had "[s]evere [r]ight median neuropathy across the wrist as can be seen with carpal tunnel syndrome."  (Tr. 711.)

At the Cambridge Medical Center, it was noted that Plaintiff had "bilateral carpal tunnel syndrome (right evident on EMG, left side not performed)."  (Tr. 564; *see* Tr. 711.) Plaintiff's motor strength was "5/5 throughout" and his sensation "intact to touch throughout."  (Tr. 564.)  Plaintiff was prescribed bilateral wrist splints.  (Tr. 564.)

30

Plaintiff saw Dr. Deye approximately two weeks later.  (Tr. 568.)  Plaintiff told Dr. Deye, "'I have severe carpal tunnel and don't want to have surgery.'"  (Tr. 568.)  Plaintiff reported that he "[c]ontinue[s] to have tingling at night," but the wrist splints help.  (Tr. 568.)  Dr. Deye encouraged Plaintiff to consult with orthopedics if the wrist splints did not improve his carpal tunnel symptoms.  (Tr. 569.)

An examination at the Minneapolis Clinic of Neurology in January 2015 revealed "positive Tinel's at the wrists bilaterally," and Plaintiff was diagnosed with carpal tunnel syndrome.  (Tr. 753.)

At the end of the year, when Plaintiff saw Dr. Deye, he had no chief concerns and he reported caring for his wife who recently broke her arm and needed surgery.  (Tr. 986, 988.)  Plaintiff described himself as "'her right hand man.'"  (Tr. 986.)

### ii.  Disability Reports & Hearing Testimony

In his function report, Plaintiff stated that "carpal tunnel problems make typing and fine work for long periods difficult."  (Tr. 363; *see* Tr. 375.)  Plaintiff also reported that his "hands go numb" due to carpal tunnel syndrome.  (Tr. 368; *see* Tr. 375.)

At the hearing, Plaintiff testified that he had "carpal tunnel issues."  (Tr. 227.)  When the vocational expert identified a cleaning position in response to a hypothetical, Plaintiff testified that "[h]andling a mop would probably exacerbate and cause a lot of problems with carpal tunnel . . . ."  (Tr. 228.)

### iii.  Opinion Evidence

In relevant part, the state agency medical consultants opined that Plaintiff had certain exertional and manipulative limitations in his right upper extremity.  The state

agency medical consultants opined that Plaintiff was limited to "frequent" pushing, pulling, and use of hand controls with his right hand due to carpal tunnel syndrome. (Tr. 239; *accord* Tr. 254.) Plaintiff was also limited to "frequent" gross and fine manipulation with his right hand. (Tr. 239; *accord* Tr. 254.)

### iv. Analysis

Testing on Plaintiff's right hand in 2014 lead to a diagnoses of carpal tunnel syndrome in both hands despite Plaintiff's left hand not being tested. Plaintiff was prescribed wrist splits for both hands. In 2015, a neurological examination revealed "positive Tinel's at the wrists bilaterally." (Tr. 753.) The ALJ found and concluded that Plaintiff's "*right* carpal tunnel syndrome" was a severe impairment and included exertional and manipulative limitations with respect to Plaintiff's right hand. (Tr. 13 (emphasis added), 17.)

Plaintiff argues that the ALJ "failed to note . . . positive physical examination findings, diagnoses, and recommended medical treatment for [his] left upper extremity," citing pages 564, 711-19, and 753 of the record. (Pl.'s Mem. in Supp. at 9.) The ALJ, however, specifically cited the same positive physical examination findings, diagnoses, and recommended medical treatment (wrist splints) that Plaintiff argues were disregarded. When determining that Plaintiff's carpal tunnel did not meet or equal a listed impairment, the ALJ wrote: "The record shows carpal tunnel syndrome confirmed with electromyogram (EMG) testing and positive Tinel's and Phalen's sign for both wrists, but does not show disorganization of motor function related to carpal tunnel syndrome. The carpal tunnel syndrome was treated with wrist splits." (Tr. 14 (citing Tr. 563-64, 711-13, 753).)

When assessing Plaintiff's residual functional capacity, the ALJ wrote:

> The bilateral carpal tunnel syndrome was confirmed with EMG testing and findings of positive Tinel's and Phalen's testing, but there was only very limited treatment for this. [Plaintiff] was seen in March 2013 for left elbow pain after lifting up the plow on his 4-wheeler. In June 2013, he said he was working in the shop but left elbow pain was waking him up at night. He showed bursitis and tenderness on examination. However, he declined a referral to a specialist and continued using over-the-counter non-steroidal anti-inflammatory medications. In the September 2014 neurological evaluations for fatigue, he showed full (5/5) motor strength in the upper extremities and intact sensation, reflexes, and coordination. In testing for myasthenia gravis, he showed no fatigable weakness with arms abducted. He was given wrist splints. In January 2015, he had positive Tinel's and Phalen's testing bilaterally but no weakness or tenderness on examination. The neurologist noted he reported some intermittent and minimal sensory symptoms but no focal weakness or atrophy. There was no evidence of significant hand or arm pain in physical examinations, or of inability to use the hands for manipulative activities.

(Tr. 24-25 (citing Tr. 513, 520-22, 563-64, 710, 752-53).) The ALJ's discussion of the medical evidence demonstrates that the positive physical examination findings, diagnoses, and recommended treatment concerning Plaintiff's carpal tunnel syndrome were in fact considered and not disregarded.

Plaintiff next argues that the ALJ did not "take into account . . . his limitations on handling and fingering in both of his hands" and "fail[ed] to appropriately limit [his] ability to handle and finger in light of his bilateral carpal tunnel and wrist splints." (Pl.'s Mem. in Supp. at 9.) Plaintiff does not identify though what those "appropriate[] limit[ations]" would be and how the ALJ's residual-functional-capacity determination exceeded those limitations. Most importantly, Plaintiff does not point to medical evidence showing he has

33

greater limitations than determined by the ALJ in either his right or his left hand.  It is Plaintiff's burden to prove his residual functional capacity.  *See Perks*, 687 F.3d at 1092; *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).

In essence, Plaintiff has relied on his diagnosis of bilateral carpal tunnel syndrome alone.  But, merely being diagnosed with a medically determinable impairment is not sufficient.  *See Perkins v. Astrue*, 648 F.3d 892, 899-900 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011).  The fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability."  *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004).

The ALJ repeatedly pointed to places in the record showing that Plaintiff exhibited normal strength during physical examinations notwithstanding his carpal tunnel diagnosis.  (Tr. 24, 25.)  The ALJ also cited multiple places in the record where Plaintiff engaged in a wide variety of activities requiring the use of his hands, including performing "some light chores, prepar[ing] simple meals, mow[ing] the lawn with a rider mower, plow[ing] snow, d[oing] minor household repairs, and d[oing] things in the garage like taking apart an old sewing machine to see how it worked," (Tr. 15; *see* Tr. 23); "etching jewelry, welding, making a computer stand for his treadmill, making a DC motor mount for a shaper, [and] repairing a garage door," (Tr. 16; *see* Tr. 23); caring for his wife while she recovered from surgery, (Tr. 23); and moving appliances, (Tr. 23).    Further, the exertional and manipulative limitations included by the ALJ were consistent with the opinions of the state agency medical consultants.

Notwithstanding his diagnoses of bilateral carpal tunnel syndrome, Plaintiff has not identified how any failure to consider this diagnosis in *both* hands impacted the ALJ's findings and conclusions with respect to his residual functional capacity and any functional limitations. *See Byes*, 687 F.3d at 917. Plaintiff has not pointed to any medical evidence demonstrating greater physical limitations in either of his upper extremities than determined by the ALJ. Plaintiff has not challenged the weighing of the opinion evidence. Nor has Plaintiff challenged the ALJ's determination that his subject complaints were not wholly credible based on the activities he engaged in.

As stated above, the ALJ's thorough discussion of the relevant medical evidence demonstrates that Plaintiff's carpal tunnel syndrome, including his use of wrist splints, was considered. Plaintiff has not met his burden to show that he has greater functional limitations in his upper extremities than determined by the ALJ.

### 3. Evidence Submitted to Appeals Council

Lastly, Plaintiff argues that the Appeals Council erred as a matter of law when it did not consider new evidence he submitted along with his request for review.

As an initial matter, the Commissioner argues that this Court lacks jurisdiction to review a challenge to the Appeals Council's decision to deny review because the ALJ's decision, not the Appeals Council's decision, is the final decision of the Commissioner. Courts in this District have dismissed such an argument in cases like this where the claimant is challenging the Appeals Council's rejection of new evidence. *See, e.g.*, *Gelner v. Berryhill*, No. 17-cv-4202 (JNE/KMM), 2018 WL 3946520, at *3 (D. Minn. July 24, 2018), *adopting report and recommendation*, 2018 WL 3946476 (D. Minn. Aug. 16, 2018);

*Stimpson v. Berryhill*, No. 17-cv-824 (HB), 2018 WL 1440336, at *4 (D. Minn. Mar. 22, 2018); *see also Snelbaker v. Colvin*, No. C16-2020, 2016 WL 7340299, at *5-6 (N.D. Ia. Dec. 19, 2016) (summarizing review of new evidence submitted to Appeals Council under Eighth Circuit precedent).

As stated above, Plaintiff submitted additional evidence to the Appeals Council as part of his request for review. This evidence consisted of medical records from 2010; his own diary/journal entries from December 2014 through March 2017; and a medical source statement from Dr. Abuzzahab, dated April 1, 2017. (Tr. 2; *see* Tr. 76-102, 104-88.)

Under the regulations, the Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).[18]

With respect to the 2010 medical records, Dr. Abuzzahab's medical source statement and Plaintiff's diary/journal entries through December 31, 2016 (the date last insured), the Appeals Council determined that the evidence did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision." (Tr. 2.) Accordingly, the Appeals Council "did not consider and exhibit this evidence." (Tr. 2.) As for Plaintiff's diary/journal entries from January through March 2017, the Appeals Council stated "[t]he additional evidence d[id] not relate to the period at issue." (Tr. 2.)

---

[18] Section 404.970, the regulation governing Appeals Council review, was amended effective January 17, 2017, applicable as of May 1, 2017. *Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed. Reg. 90987, 90987, 90991, 90994 (Dec. 16, 2016); *see, e.g.*, *Hargress v. Soc. Sec. Admin.*, 883 F.3d 1302, 1039 n.4 (11th Cir. 2018) (per curiam). The Appeals Council's decision is dated December 29, 2017. (Tr. 1.) The Appeals Council applied the amended version of § 404.970.

Because Plaintiff's case was decided "through December 31, 2016," this evidence did "not affect the decision about whether [he was] disabled beginning on or before December 31, 2016." (Tr. 2.)

Plaintiff does not address any of § 404.970's criteria in arguing that the Appeals Council erred by not considering this evidence.[19]  The sum of Plaintiff's argument is contained in three sentences:

> However, Plaintiff's journal entries would have bolstered his credibility, which was very much in issue, according to [the ALJ's] decision.  Additionally, Dr. Abuzzahab's chart notes are unclear and, at times, illegible.[20]  His 2017 report simply clarifies the information that is presumably already within his records.

(Pl.'s Mem. in Supp. at 11.)

Plaintiff has not made any attempt to demonstrate that there is a reasonable probability that the additional evidence would change the outcome of the ALJ's decision. While Plaintiff suggests that his diary/journal entries would bolster his credibility, Plaintiff has not articulated what in particular is to be gleaned from his diary/journal entries

---

[19] The Court uses "considering" in the proper context.  It is clear that the Appeals Council considered the evidence in the colloquial sense, *i.e.*, it examined the evidence.  After examining the evidence, the Appeals Council found that it did "not show a reasonable probability that it would change the outcome of the decision," and therefore it "did not consider and exhibit this evidence."  (Tr. 2.)  As stated by the Commissioner, any "suggestion that the Appeals Council did not consider the evidence produces an absurd result—that the Appeals Council concluded that the evidence did not create a reasonable probability of a different result without ever 'considering' this evidence." (Comm'r's Mem. in Supp. at 16.)  Another district court has similarly construed the Appeals Council's less-than-ideal phrasing.  *See Steven D.A. v. Comm'r of Soc. Sec.*, No. 17-cv-819-CJP, 2018 WL 3438856, at *7 (S.D. Ill. July 17, 2018) ("The Court agrees with defendant that the Appeals Council's explanation means that it considered the additional evidence and determined that it was not material because it was not likely to change the outcome of the case.  Obviously, the Appeals Council could not have concluded that the additional evidence 'does not show a reasonable probability that it would change the outcome of the decision' if it had not considered the additional evidence at all.  The second sentence is admittedly not as clear as it could be.  However, read in context, the second sentence most plausibly means that the Appeals Council did not consider the additional evidence as part of a plenary review because it denied review.").
[20] The Court made a similar observation.  *See supra* n.13.

37

regarding his credibility. And, again, Plaintiff has not challenged the ALJ's assessment of his credibility.

Plaintiff has not argued that, based on Dr. Abuzzahab's opinion, his severe impairments singly or in combination meet or equal a listed impairment. While the Court recognizes that Dr. Abuzzahab is a treating physician, Plaintiff has not articulated how Dr. Abuzzahab's medical source statement would impact the ALJ's residual-functional-capacity determination. The only reference to the content of Dr. Abuzzahab's medical source statement is a few sentences in Plaintiff's summary of his impairments. (Pl.'s Mem. in Supp. at 7 ("Dr. Abuzzahab has indicated moderate to extreme limitations in Plaintiff's ability to function independently and on a sustained basis. Dr. Abuzzahab has also opined that Plaintiff has been off task 25% or more of the time and that he struggles with chronic absenteeism as a result of his medical conditions." (citations omitted).) Nor has Plaintiff argued that the ALJ failed to develop the record adequately in this case.

In sum, Plaintiff has done nothing more than assert in conclusory fashion that the Appeals Council erred by not considering the new evidence. Plaintiff is represented by counsel and the Court will not craft arguments for him. *See Laveau v. Astrue*, No. 11-cv-505 (SRN/LIB), 2012 WL 983598, at *12 n.6 (D. Minn. Feb. 14, 2012), *adopting report and recommendation*, 2012 WL 983630 (D. Minn. Mar. 22, 2012). Plaintiff's failure to explain why there is a reasonable probability that the additional evidence would have changed the outcome of the ALJ's decision has waived the issue.[21] *See Hacker v. Barnhart*,

---

[21] In a similar vein, Plaintiff has not articulated what effect this additional evidence has on whether the ALJ's decision is supported by substantial evidence in the record as a whole. *See Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000) ("Here, the Appeals Council denied review, finding that the new evidence was either not material or

459 F.3d 934, 937 n.2 (8th Cir. 2006) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (quotation omitted)); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("We reject out of hand Vandenboom's conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because Vandenboom provides no analysis of the relevant law or facts regarding these listings."); *see also Byes*, 687 F.3d at 917.

[Continued on next page.]

---

did not detract from the ALJ's conclusion.  In these circumstances, we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination." (citing *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992)); *accord Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 15) be **GRANTED**.

Dated: January__28__, 2019                                  _s/ Tony N. Leung_
                                                            Tony N. Leung
                                                            United States Magistrate Judge
                                                            District of Minnesota


                                                            _Joseph R. C. v. Berryhill_
                                                            Case No. 18-cv-456 (JRT/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).